**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KENDALL Y. AGUASVIVAS,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 4:04-1279** |
| v. | : | **(MCCLURE, D.J.)** |
| | : | **(MANNION, M.J.)** |
| **JO ANNE B. BARNHART,** **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

This is a Social Security disability case wherein the minor plaintiff, Kendall Aguasvivas, is seeking review of the decision of the Commissioner of Social Security ("Commissioner") which denied her claim for Supplemental Security Income as a disabled child under Title XVI of the Social Security Act, ("Act"), 42 U.S.C. §1381-1383(d).

**I. Background.**

On March 14, 2002, Tonya Lynn Aguasvivas, protectively filed an application for Supplemental Security Income ("SSI") on behalf of her daughter, Kendall Aguasvivas, a child under the age of 18, alleging that she was disabled as of July 30, 1994, as a result of attention deficit hyperactivity disorder, vision, asthma and a learning disability. (TR. 15).

After the claim was denied initially and upon reconsideration, a timely request for a hearing before an Administrative Law Judge ("ALJ") was filed

and the hearing was held on June 19, 2003. (TR. 187-203). On August 8, 2003, the ALJ issued a decision in which he found the following: that the plaintiff had not engaged in any substantial gainful activity at any time; that the plaintiff had attention deficit hyperactivity disorder, a personality disorder, several eye impairments, including left eye amblyopia[1]; that these impairments were severe, but the combined effects of these impairments did not meet, medically equal, or functionally equal in severity the criteria of any of the listed impairments in Appendix I, Subpart P, Regulations No. 4 (20 C.F.R. § 416.924(d)), and that the allegations regarding the plaintiff's limitations were not wholly credible. As a result, the ALJ concluded that the plaintiff was not under any "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision (20 C.F.R. § 416.924(d)). (TR. 23).

The plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on May 17, 2004. (TR. 9-10). Thus, the ALJ's decision became the final decision of the Commissioner. 42 U.S.C. § 405(g). (TR. 4-6).

---

[1] Amblyopia: Reduction or dimness of vision, esp. that in which there is no apparent pathological condition of the eye. Taber's Cyclopedic Medical Dictionary at 81 (19th ed. 2001).

2

**II. Eligibility Evaluation Process.**

In 1996, Congress altered the statutory disability standard for children seeking SSI. Pub.L. No. 104-193 (August 22, 1996). Section 211(a)(4) of the 1996 legislation, codified at 42 U.S.C. § 1382c(a)(3)(C)(I) provides:

> An individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Pub.L. No. 104-193 § 211(a)(4).

Rules applicable to childhood disability cases became effective January 2, 2001, and prescribe a three-step sequential evaluation, under which the ALJ must consider (1) whether the child is engaging in substantial gainful activity; (2) whether the child has a medically determinable impairment (physical or mental) or combination of impairments that is severe; and, if the impairments are severe, (3) whether the child's impairment meets, medically equals, or functionally equals in severity any of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. See, 20 C.F.R. § 416.924(a).

A child meets the listing if the specific findings detailed within the description of a listing exist with respect to that child's diagnosis. 20 C.F.R. § 416.924(d)(1). A child medically equals a listing if the medical findings with respect to the child's impairment are at least equal in severity and duration to

the listed findings. 20 C.F.R. § 416.926(a). In order to establish functional equivalence, a child must have a medically determinable impairment, or combination of impairments, which results in marked limitations in two domains of functioning, or in an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). In order to be eligible for child's SSI, these marked and severe functional limitations must also be expected to result in death, or have lasted, or be expected to last for a continuous period of not less than twelve (12) months. 42 U.S.C. § 1382c(a)(3)(C)(I).

There are six domains of functioning used in determining functional equivalence: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(I)-(vi). A marked limitation in a domain is found when an impairment interferes seriously with an individual's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A marked limitation is more than moderate but less than extreme. Id. An extreme limitation in a domain is found when the impairment interferes "very seriously" with the individual's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). An extreme limitation is more than marked and is given to the worst limitations. Id. An additional factor which is considered in determining functional equivalence is an assessment of whether or not the activities of the

child asserting disability are typical of other unimpaired children of the same age. 20 C.F.R. § 416.926a(b)(2).

**III. Evidence of Record.**

Plaintiff was born on July 30, 1994. At the time of the application for benefits she was 8 years old. The alleged disability date is the date of birth. (TR. 15, 51, 69-79). The child has four siblings: Britney,12; Myrta, 11; Bill, 9, and Damion, 1.

This is not the first application which was filed on behalf of the plaintiff. The record indicates that an application for benefits was filed on October 3, 1995. (TR. 66). The record is silent as to the disposition of that application. The records further indicate that the plaintiff's mother, and two of the plaintiff's siblings receive Supplemental Security Income. (Doc. No. 2).[2] Apparently the plaintiff's brother's disability is Attention Deficit Hyperactivity Disorder ("ADHA"), Oppositional Defiant Disorder ("ODD"), depression and psychosis. (TR. 130).

The plaintiff was in the third grade at the time of the hearing in this

---

[2]At the time the application for benefits was filed on April 11, 2002, the plaintiff's mother reported that only Bill Aguasvivas had filed for/or was receiving SSI benefits. (TR. 60). The plaintiff's application to proceed in forma pauperis dated June 14, 2004, indicates that at that time the plaintiff's mother was not working and was receiving $598.00 per month in SSI benefits, and $574.00 per month "for each of my two children." (Doc. No. 2).

5

matter. She has never been in special education classes, although she has received learning support. Her third grade teacher, Deborah H. deVitry, prepared a report dated September 12, 2002. At that time the school year had just begun and Ms. DeVitry stated that she had known the plaintiff for only 13 days. She reported that the plaintiff was in regular education classes, and that there were no "special services" provided for the plaintiff, although she did receive learning support in the nature of 35 minutes for reading and writing, 45 minutes for math, and 45 minutes for English as a Second Language ("ESL").[3] She reported that the plaintiff had great difficulty focusing, and needed constant reinforcement to stay on task and complete her assignments. (TR. 96-99).

The plaintiff's second grade teacher, Krista M. Burkel, reported on May 29, 2002, that she had known the plaintiff for 9 months. It was her opinion that when the plaintiff was on her medication, "she's fine." When she was not on her medication, however, she was a problem. She bothered others, would make noises, daydream, sing, and suck her thumb. Ms. Burkel remarked that the plaintiff frequently didn't have or wear her glasses, which she felt was a necessity. (TR. 93). She noted further that the child was "very lovable...always wants hugs and attention," and that she "always wants to be near kids...the

---

[3] A Student Profile Summary dated January 16, 2002, states, "Not sure why Kendall is receiving [ESL] support when Kendall speaks no Spanish at all." (TR. 114).

kids accept her, she has great friendships." (TR. 92).

The plaintiff's primary care physician is Chad E. Lamendola, M.D., a member of the Lancaster Health Alliance System.  Dr. Lamendola started treating the plaintiff on February 1, 2001. (TR. 130-131).  The plaintiff's application for disability benefits was filed on March 14, 2002. (TR. 15).  The plaintiff's history was notable for asthma, and for several surgeries for amblyopia. (TR. 130-131). The plaintiff's mother reported that although the child appeared to be hyperactive and inattentive, she was not aware of a learning disorder. (TR. 130). The plan was to refer the plaintiff to an eye specialist, and Ritalin was prescribed.

Dr. Lamendola's records indicate that, once the medication regime was adjusted, the plaintiff's mother reported that the plaintiff had improved.  On January 28, 2003, however, Dr. Lamendola examined the plaintiff, who was accompanied by her stepfather. The stepfather told Dr. Lamendola that things were "not going well."  He stated  that the plaintiff "may or may not be" taking her medication.  Dr. Lamendola stated that it was "questionable whether she is taking the Clonidine at all." (TR. 154).

A note dated March 4, 2003, written by Christian Hermansen, M.D., also of the Lancaster Health Alliance practice,  indicated that the plaintiff was there for a "CPE"[4], and that from a physical standpoint, there were no problems,

---

[4]Complete Physical Examination. Medical Abbreviations at 97 (12th ed. 2005)

other than the stated diagnosis of asthma. As far as the ADHD diagnosis, Dr. Hermansen noted that the mother forgot to bring the plaintiff's school records to the evaluation. He wrote that the mother reported that the plaintiff was doing well in some classes, but "not so well" in reading. She stated that the plaintiff had recently been falling asleep in class, but "was able to finish her assignments." (TR. 155).

The plaintiff was evaluated by David I. Silbert, M.D., an eye specialist, on February 28, 2002. He recommended that she patch the right eye. On November 22, 2002, Dr. Silbert noted that the plaintiff was patching reliably, and that there was very mild improvement. He told the plaintiff's mother to get eyeglasses for the plaintiff and to have her eyes rechecked. (TR. 163). In follow-up he noted that the plaintiff had no glasses and that he again told the mother to get the plaintiff glasses and have her eyes rechecked. (TR. 165). Improvement was noted on January 28, 2003. On February 4, 2003, Dr. Silbert recommended that the plaintiff patch "religiously...three hours per day during the weekdays and six hours per day on the weekends." (TR. 169). However, on April 3, 2003, it was noted that the plaintiff was patching only one to two times per week. (TR. 167, 170).

The Agency referred the plaintiff for evaluation to Lynnette Ruch, Ph.D., on August 18, 2002. Clinical testing was not undertaken because the plaintiff refused to cooperate. Dr. Ruch stated that the plaintiff had great difficulty sitting still, and paying attention, and that she was oppositional. Dr. Ruch

noted that the plaintiff had never had psychological counseling, and that although she should have been wearing glasses, she was not. Dr. Ruch further noted that there was "poor enforcement" of the child's needs.

Dr. Ruch noted little evidence of speech or language problems and that the plaintiff was restless and hyperactive, with a short attention span. There were no perceptual disturbances noted. Dr. Ruch stated, "it appears that there is very limited structure and serious behavioral problems with siblings at home." She was of the opinion, however, that with assistance the plaintiff should "do fairly well" in school. The diagnoses were:

>AXIS I:    Attention-deficit/hyperactivity disorder, combined type, moderate and severe; oppositional defiant, moderate to severe.
>
>AXIS II:   Rule out mild mental retardation.
>
>AXIS III:  Blind in left eye, has asthma.
>
>AXIS IV:   Psychological stressors, parenting issues, mother works long hours, family issues, in special education services
>
>AXIS V:    Current GAF is 40.

(TR. 138-142).

An Agency non-examining, non-treating physician performed an evaluation based on the record on April 11, 2002, which concluded that the plaintiff had impairments which in combination were severe, but which did not meet or medically equal any listing. The impairments were ADHD, ODD, asthma and amblyopia of the left eye. It was determined that there was no

limitation in acquiring and using information, moving about and manipulating objects, or in caring for herself, and less than marked limitation in attending and completing tasks or in interacting and relating with others. (TR. 147-152).

A "Vocational Report" dated April 5, 2003, prepared by Kathleen Taddonion, M.S.W., L.S.W., states that a Dr. Ronald Refice undertook a records review, and concluded that the records demonstrated that the plaintiff met the criteria for listings 112. 08 and 112.11, which deal with Impairments for Personality Disorder and Attention Deficit Hyperactivity Disorders. (TR. 174-179). It is readily apparent that the writer of this document relied in significant part upon the opinions and conclusions expressed by Dr. Ruch, and unverified statements made by the plaintiff's mother. There is no indication that the plaintiff was examined or tested. (TR. 174-179).

The hearing in this matter was held on June 19, 2003. The child was not at the hearing. The plaintiff's mother testified that the plaintiff was "sleeping." (TR. 192). She stated that the plaintiff was oppositional, easily distracted, and frequently refused to take her medications. The mother stated that on the occasions when it appeared that the plaintiff had not taken her medications, she would take the medications into school in order to assure that she took them. She stated that the plaintiff had no friends, and would not "stay on task" long enough to take care of her personal grooming. She said that the plaintiff won't eat properly; that she fights with her siblings and is easily distracted by other children in class. (TR. 189-202).

10

**IV. Discussion.**

The plaintiff argues that the Commissioner committed three errors at the administrative level. Specifically, the plaintiff avers that the ALJ: (1) erred in failing to conclude that the plaintiff's impairments meet or equal a listed impairment; (2) erred in failing to consider all of the plaintiff's impairments in combination, and (3) erred in failing to properly investigate and properly analyze all possible reasons for the plaintiff's non-compliance with prescribed treatment. She maintains that the decision of the ALJ is not supported by substantial evidence, and that a more balanced review of the record must compel the conclusion that she was disabled since birth, the alleged onset date of disability. She requests that this court reverse or remand this matter. (Doc. Nos. 1, 18).

The Commissioner responds that the sole issue is whether substantial evidence supports the ALJ's finding that, despite her impairments, the plaintiff is "not disabled" as defined by the Act. (Doc. No. 24).

    **A.  THE ALJ DID NOT ERR IN CONCLUDING THAT THE PLAINTIFF'S IMPAIRMENTS DID NOT MEET OR FUNCTIONALLY EQUAL A LISTED IMPAIRMENT.**

The plaintiff argues, "although [the ALJ] wrote pages of summary in her decision with regard to the Plaintiff's behavioral and emotion problems, she

apparently did not consider such behavior in determining the Plaintiff's limitations." (Doc. No. 9, p. 3). A fair reading of the ALJ's decision, which is exhaustive, reveals that this claim is without merit. The ALJ noted, that the record as a whole did not support statements made by the plaintiff's mother regarding the alleged severity of the plaintiff's behavioral problems. The ALJ stated:

> It is also noted in the school records that the claimant was fine when she was on medication. Furthermore it was noted by the psychologist that though the mother reported that the claimant had taken her medication, it was not clear if that was accurate and in addition it appeared that there was very limited structure and serious behavioral problems with siblings at home which also interfered with the claimant's progress. In addition most of the information for [the psychologist's] evaluation and the conclusions drawn were furnished by the claimant's mother because of the claimant's behavior and as noted below the mother is not fully credible...
>
> ...As to the behavior/attention/focus problems one teacher noted that the claimant's behavior was fine on medication. It is also significant to note that this statement was made following a several month period when the claimant was receiving medication at school. The primary care physician who prescribes and adjusts the medication did not indicate any behavior problems in his notes with the exception of one time in January 2003 when the stepfather brought the claimant and advised that the claimant had not taken her medication and that at times she was spitting it out. The physician advised the stepfather that it was essential that the claimant be monitored when she swallowed her medication and that they needed to make sure that she was actually swallowing it and they also needed to make sure that she was going to school and that she took her medication at bedtime. It is also noted that the psychologist who evaluated the claimant noted that there was poor enforcement. The school records also indicated that the claimant did not exhibit any problems during lunch, in gym or at recess. There is also no indication that the claimant has received any counseling or treatment from a mental health provider or been

12

>evaluated by a psychiatrist.  The claimant has also not been held back in any class for academic or behavior reasons, although it is noted that she has a history of unexcused absences from school and excessive tardiness. Also the school records indicate that the claimant has great friendships and that she organizes her work and belongings.  The school records also seem to indicate that part of the claimant's problem is her vision problem and her failure to wear glasses...

(TR. 21-22).

It is evident that the ALJ did analyze and evaluate the plaintiff's behavioral and emotion problems. Thus, there is substantial evidence to support the ALJ's conclusion that the plaintiff's impairments, although severe, did not result in marked or significant limitations in the six domains listed above.  As a result, the decision should not be disturbed in this regard.

### B.  THE ALJ DID NOT ERR IN FAILING TO CONSIDER ALL OF THE PLAINTIFF'S IMPAIRMENTS IN COMBINATION.

The plaintiff next argues that the ALJ did not consider all of the plaintiff's impairments in combination when she concluded that the plaintiff's impairments did not meet or functionally equal a listed impairment. The plaintiff states, "there is no evidence that [the ALJ] evaluated the severity of the Plaintiff's asthma or that she considered this medical condition in determining functional equivalence." There is no merit to this claim.  There is nothing in the medical records to suggest that the plaintiff's diagnosis of asthma had any significant impact upon the plaintiff's functioning in any of the

13

6 domains, and the plaintiff does not point to any such evidence. As a result, the decision should not be disturbed in this regard.

### C. THE ALJ PROPERLY ANALYZED THE REASONS FOR THE PLAINTIFF'S NON-COMPLIANCE WITH PRESCRIBED TREATMENT.

The plaintiff's final complaint is that the ALJ did not properly investigate possible reasons for the plaintiff's non-compliance with prescribed treatment. The plaintiff states:

> [The ALJ] failed to follow SSR 82-59 by not making a determination as to whether or not that failure to follow prescribed treatment was justified. SSR 82-59 provides that a claimant should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. In addition the record must reflect as clearly and accurately as possible, a claimant's reason's for failing to follow the prescribed treatment. The Plaintiff's Mother, in this case, was not given such an opportunity to fully express the reasons for the Plaintiff's not following the prescribed treatment, and, therefore, the record does not reflect, clearly and accurately the Plaintiff's reasons for not following the prescribed treatment.

This argument has no basis in the record and is without merit. The ALJ, Dr. Ruch, Dr. Lamendola, Dr. Silbert, Dr. Refice, Ms. Taddonion, the plaintiff's stepfather, and the plaintiff's teachers all noted that the plaintiff's non-compliance with prescribed treatment was due to the fact that there was a serious problem with enforcement in the home.

In fact, in direct contradiction to the opinions of these many individuals, the plaintiff's mother testified that there was no significant problem with the

plaintiff's refusal to take her medications because she herself would take the medications to the school to insure that the plaintiff took the medication. No school records document this statement. Furthermore, she stated that the plaintiff was not wearing her glasses because she had repeatedly either lost or broken them.  Dr. Silbert's notes indicate that the child never appeared at his office with her glasses, and he expressed his concern about this, and the plaintiff's non-compliance with patching, several times.  There were other inconsistent statements made by the plaintiff's mother.  For example, she testified that the claimant won't eat, however there is no evidence in any of the medical records of weight loss or any reports that the plaintiff was not eating. (TR. 197).  She also reported that the claimant had speech problems and that she had been treated at Philhaven Psychiatric Clinic. (TR. 82). There is no evidence that the plaintiff ever complained of, or was treated for, a speech impairment, and Philhaven reported on July 9, 2003, that the plaintiff was never treated there. [5] (TR. 50, 149 ).

The responsibility for the plaintiff's compliance with prescribed treatment rests with her parents. This fact was clearly and accurately set forth not only by the ALJ, but by every professional involved in this case.  To require the ALJ to further "investigate" the reasons for the  claimant's non-compliance would most likely be non-productive, as the primary reporting source appears

---

[5]The plaintiff's mother testified at the hearing that the plaintiff had started treating at Philhaven, "in the last three weeks." (TR. 190).

15

to be unreliable. As a result, the decision should not be disturbed in this regard.

## VI.  RECOMMENDATION

On the basis of the foregoing, **IT IS RECOMMENDED THAT:** the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. No. 1), be **DENIED.**

> **s/ Malachy E. Mannion**
> **MALACHY E. MANNION**
> **United States Magistrate Judge**

**Dated:   April 25, 2005**